IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| J.H.; B.H.; L.H.; G.M.; and S.M.,[1] | : | **Civil Action No.** |
| Plaintiffs, | : | |
| | : | |
| v. | : | JUDGE |
| | : | |
| MULTI-COUNTY JUVENILE | : | |
| DETENTION FACILITY, | : | MAGISTRATE JUDGE |
| 923 Liberty Dr. | : | |
| Lancaster, OH 43130-8045, | : | |
| | : | |
| and | : | |
| | : | |
| DANA C. MOORE, in both her individual | : | |
| and official capacities, | : | |
| Assistant Superintendent | : | |
| Multi-County Juvenile Detention Facility | : | |
| 20475 Winstead Rd. | : | |
| Stoutsville, OH 43154-9612, | : | |
| | : | **JURY DEMAND ENDORSED HEREON** |
| Defendants. | : | |

**COMPLAINT**

I.  **Preliminary Statement**

1. This action seeks declaratory, injunctive, and equitable relief; compensatory and, from the individual defendant, punitive damages; post-judgment interest; costs; and reasonable attorneys' fees, for Defendants' purposeful or recklessly indifferent violations of the Eighth Amendment as incorporated in the Fourteenth Amendment to the United States Constitution when, despite the entreaties of juvenile prisoners, their families, and Defendants' staff, they

---

[1] Plaintiffs consist of individuals adjudicated to be juvenile delinquents and, for Plaintiffs who are still minors, their guardians. A Motion for Leave to File Complaint and Proceed Using Initials has been filed contemporaneously with this Complaint, and Defendants will be informed of the Plaintiffs' full names.

-- 1 --

established and pursued policies that had their Juvenile Detention Officers (1) use restraint chairs for punitive purposes, locking Plaintiffs J.H. and B.H. and other juvenile prisoners in them for hours long after any need to restrain them had ended, proximately causing pain and emotional distress; and (2) place Plaintiffs and other juvenile prisoners for lengthy periods in solitary confinement in isolation cells where the temperatures were regularly in the 50's, inadequate clothing and blankets were provided, and leaving the cells for exercise or other activities was significantly limited, proximately causing juvenile prisoners to suffer the symptoms of frostbite and hypothermia, such as burning, numbness, tingling, itching, cold or diminished sensations, swelling, blisters, and/or purplish blue skin on their fingers or toes, uncontrollable shivering of their body and chattering of their teeth, dizziness, nausea, confusion, and impaired decision-making; the emotional distress of having their pleas for relief ignored; and the anxiety that the symptoms would result in permanent injury.

## II.  Jurisdiction and Venue

2. Jurisdiction over claims brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, is conferred on this Court by 28 U.S.C. §§1331, 1343(3) and (4).

3. Declaratory, injunctive, and equitable relief and compensatory and, from the individual defendant, punitive damages are sought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201; 2202.

4. Costs and attorneys' fees may be awarded pursuant to the 42 U.S.C. § 1988 and Fed. R. Civ. P. 54.

5. Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) and S.D. Ohio Civ. R. 82.1 because the events or omissions giving rise to the claim occurred in Fairfield County, Ohio, where Defendants are located and institutionalize juveniles.

### III. Parties

6. J.H, age 18, was institutionalized, after being adjudicated a juvenile delinquent, at Defendant Multi-County Juvenile Detention Facility under the supervision of Defendant Moore from late April 2013 through August 2013.

7. B.H., age 17, was institutionalized, after being adjudicated a juvenile delinquent, at Defendant Multi-County Juvenile Detention Facility under the supervision of Defendant Moore from May of 2013 through February of 2014.

8. L.H., is the parent and natural guardian of B.H., and brings this action on his behalf.

9. G.M., age 16, was institutionalized, after being adjudicated a juvenile delinquent, at Defendant Multi-County Juvenile Detention Facility under the supervision of Defendant Moore on several occasions, most recently from mid-January, 2014, to May 14, 2014.

10. S.M. is the adoptive mother and guardian of G.M., and brings this action on her behalf.

11. Defendant Multi-County Juvenile Detention Center ("Center"), a maximum security facility, is funded by the Ohio Counties of Fairfield, Licking, Hocking, and Perry, whose Commissioners comprise the Center's Joint Board of Commissioners which adopts an annual budget, appropriates all monies, and approves all grants and contracts for the Center; has sue-and-be-sued capacity under O.R.C. § 305.12; at all times material to this Complaint, was a "person" under 42 U.S.C. § 1983 and acted under color of law; and controls through its policies the use and conditions of its isolation cells and restraint chairs.

12. Defendant Dana C. Moore, who is being sued in both her individual and official capacities, has served as the Assistant Superintendent of the Center since it opened in February

-- 3 --

2004; establishes the policies and directs the use by Juvenile Detention Officers of restraint chairs and solitary confinement in isolation cells and the conditions surrounding their use; and, at all times material to this Complaint, was a "person" under 42 U.S.C. §1983 and acted under color of law.

## IV.   Facts

13. Defendants have maintained a chilly temperature throughout the Center, and its isolation cells are the coldest areas in the Center.

14. The temperature in the Center's isolation cells hovers in the 50's and, when the weather outside is freezing or hot, becomes even colder.

15. The Center is heated, and the thermostats are placed in locations which result in the Center's isolation cells receiving little heat when the temperature outside is freezing.

16. The Center is air-conditioned, and the thermostats are placed in locations which result in the Center's isolation cells receiving excessive cold air when the temperature outside is hot.

17. The Center's isolation cells were windowless, had concrete floors without a rug or carpet, metal sinks and toilets, and a concrete sleeping bench, supplied only at night with a mattress.

18. Plaintiffs and other juvenile prisoners placed in the Center's isolation cells consistently complained to Defendants about how cold those cells were.

19. The families of Plaintiffs and other juvenile prisoners consistently complained to Defendants about how cold those cells were.

20. Some members of Defendants' staff consistently complained to Defendants about how cold those cells were.

21. Defendant Moore and the Center's Juvenile Detention Officers and health care providers knew about the complaints by Plaintiffs and other juvenile prisoners, their families, and coworkers about how cold the Center's isolation cells were.

22. Plaintiffs and other juvenile prisoners placed in the Center's isolation cells for lengthy periods regularly suffered the symptoms of hypothermia and frostbite, such as burning, numbness, tingling, itching, cold or diminished sensations, swelling, blisters, and/or purplish blue skin on their fingers or toes; had uncontrollable shivering of their body and chattering of their teeth; became dizzy or nauseous; and experienced confusion and impaired decision-making.

23. Those symptoms were usually painful and produced anxiety about permanent injury to their fingers or toes.

24. The body temperature of Plaintiffs and other juvenile prisoners placed in the Center's isolation cells often dropped to 96 degrees or so.

25. When a juvenile's body temperature falls below 96 degrees, immediate medical care for hypothermia should be sought.

26. The healthy range for a juvenile's body temperature is 97.5 degrees to 98.9 degrees.

27. When checked by Defendants' staff, some juvenile prisoners even had to be removed from their isolation cells to have their extremities warmed, and Defendants' staff knew or should have known that these prisoners exhibited symptoms of hypothermia.

28. Because Plaintiffs knew that Defendants were aware of how cold the Center's isolation cells were and did nothing to keep harm, they also suffered emotional distress at having their plight ignored.

29. Defendants used isolation cells to punish juvenile prisoners who failed to conform their conduct to the Center's rules and/or engaged in destructive or disruptive behavior.

30. Defendants calculated the amount of time a juvenile prisoner had to spend in an isolation cell as if the prisoner had been sentenced to the cell; for example, when Plaintiff G.M. returned from spending a holiday with her family, she was placed back in the isolation cell because Defendants claimed that G.M. "owed" Defendants more time there.

31. Defendants purposely ignored and/or were recklessly indifferent to the complaints from Plaintiffs and other juvenile prisoners about how cold the isolation cells were because Defendants wanted those prisoners to suffer pain, anxiety, and emotional distress.

32. Defendants reasoned that, the more intemperate the Center's isolation cells were, the more placement there would be a deterrent to Plaintiffs and other juvenile prisoners who failed to conform their conduct to the Center's rules and/or engaged in destructive or disruptive behavior.

33. Defendants further reasoned that, when Plaintiffs and other juvenile prisoners failed to conform their conduct to the Center's rules and/or engaged in destructive or disruptive behavior, they deserved to be punished, and suffering pain, anxiety, and emotional distress from intemperate isolation cells was such a punishment.

34. Plaintiffs and many of the other juvenile prisoners institutionalized at the Center have been diagnosed with behavioral or psychological conditions and/or abuse of licit or illicit drugs.

35. Defendants have, at all times material to this action, known that Plaintiffs and many of the other juvenile prisoners institutionalized at the Center have been diagnosed with behavioral or psychological conditions and/or abuse of licit or illicit drugs.

36. Placements in the Center's isolation cells rarely deterred juvenile prisoners from failing to conform their conduct to the Center's rules and/or engaging in destructive or disruptive behavior because their behavioral or psychological conditions and/or abuse of licit or illicit drugs hampered their ability to make a rational cost-benefit analysis about future punishment before they engaged in misconduct.

37. Under Ohio Admin. Code § 5120:1-8-0.4, the temperature in an isolation cell is to be mechanically raised or lowered to acceptable comfort levels.

38. Defendants were obligated to comply with Ohio Admin. Code § 5120:1-8-04.

39. Defendants purposely and/or with reckless indifference violated Ohio Admin. Code § 5120:1-8-04 to serve their deterrent and punitive ends.

40. Plaintiffs and other juvenile prisoners placed in the Center's isolation cells were provided flimsy blankets and towels that did not appreciably warm them.

41. Shoes or slippers were not permitted in the Center's isolation cells.

42. Plaintiffs and other juvenile prisoners placed in the Center's isolation cells were not provided alternative ways, such as sweaters, gloves, heavy socks, thermal underwear, or thick blankets to keep warm.

43. Juvenile prisoners placed in the Center's isolation cells typically remained in those cells for weeks.

44. Plaintiffs G.M. remained in the Center's isolation cells for nearly a month, while Plaintiffs J.H. and B.H. were there for months.

45. Plaintiffs and other juvenile prisoners placed in the Center's isolation cells were seldom provided significant time out of the cells for exercise and other activities and often allowed out only for a brief shower.

46. Plaintiffs and other juvenile prisoners placed in the Center's isolation cells ate their meals in those cells.

47. Some juvenile prisoners placed in the Center's isolation cells resorted to feigning suicidal or self-destructive behavior so that Defendants would confine them in heavy restraints that covered their bodies and helped keep them warm.

48. To protest how cold the Center's isolation cells were, some juvenile prisoners, including Plaintiff's J.H. and B.H., would use their clothing or blanket to swipe at and break off sprinkler heads, thereby soaking their cell and requiring the prisoners' removal.

49. Another protest by some juvenile prisoners, including Plaintiff's J.H. and B.H., against how cold the Center's isolation cells were was to clog or rapidly and repeatedly flush toilets until they overflowed and soaked their cell, thereby requiring the prisoners' removal.

50. When Plaintiffs J.H. and B.H. and other juvenile prisoners misused their clothing or blankets to protest how cold the Center's isolation cells were, their clothing or blanket was removed and replaced with paper underwear and sometimes a thin T-shirt.

51. Having only paper underwear and sometimes a thin T-shirt resulted in Plaintiffs J.H. and B.H. and other juvenile prisoners being even colder in the Center's isolation cells.

52. Maintaining cold isolation cells in these circumstances served no legitimate penological interest.

53. When Plaintiffs J.H. and B.H. engaged in severely destructive or disruptive behavior and seemed out of control, Defendants had their Juvenile Detention Officers place them in a restraint chair.

-- 8 --

54. The Center's restraint chair was a sturdy wheelchair to which straps were affixed in a way that, when a juvenile prisoner was bound in it, would prevent movement of the shoulders, torso, arms, and legs.

55. Defendants had their Juvenile Detention Officers maintain records reflecting that juvenile prisoners never spent more than two hours immobilized in a restraint chair.

56. Those records were falsified.

57. Plaintiffs J.H. and B.H. and other juvenile prisoners spent many hours immobilized in a restraint chair, with Plaintiff B.H. twice locked there for three hours and once for nearly six hours, while Plaintiff J.H. often spent the entire day that way.

58. Plaintiffs J.H. and B.H. and other juvenile prisoners were locked in a restraint chair long after any need to restrain them while they regained self-control had ended.

59. Defendants assumed that Plaintiffs J.H. and B.H. and other juvenile prisoners who, while in a restraint chair, said they had to urinate or defecate were lying in order to be released for a break from the immobilization and adopted a policy that Juvenile Detention Officer should regularly refuse to release them to urinate or defecate.

60. Defendants assumed that Plaintiffs J.H. and B.H. and other juvenile prisoners who, while in a restraint chair, said they were thirsty were lying in order to be given liquids which they could then spit at Juvenile Detention Officers, and Defendants adopted a policy that Juvenile Detention Officers should regularly refuse to provide requested liquids.

61. Plaintiffs J.H. and B.H. and other juvenile prisoners suffered significant discomfort after the first hour or so of being locked in a restraint chair, and that discomfort turned into pain the longer they were in the chair as their circulation was largely cut off, they felt dehydrated or the urge to urinate or defecate, and pressure sores developed.

62. Plaintiffs J.H. and B.H. and other juvenile prisoners who were locked in a restraint chair for hours at a time felt anger, resentment, and frustration and suffered emotional distress.

63. Defendants used restraint chairs to punish juvenile prisoners who failed to conform their conduct to the Center's rules and/or engaged in destructive or disruptive behavior.

64. Defendants calculated the amount of time a juvenile prisoner had to spend in a restraint chair as if the prisoner had been sentenced to the chair; for example, Plaintiffs heard Juvenile Detention Officers tell a juvenile prisoner who was completely calm that he still owed them time in the restraint chair.

65. Plaintiffs J.H. and B.H. and other juvenile prisoners complained to Defendants about misuse of the restraint chair as corporal punishment.

66. Defendants purposely and/or with recklessly indifference ignored the complaints from Plaintiffs and other juvenile prisoners about misuse of the restraint chair as corporal punishment because Defendants wanted those prisoners to suffer pain and emotional distress.

67. Defendants reasoned that, the longer and more uncomfortable a juvenile prisoner's immobilization in a restraint chair, the more placement there would be a deterrent to Plaintiffs and other juvenile prisoners who failed to conform their conduct to the Center's rules and/or engaged in destructive or disruptive behavior.

68. Defendants further reasoned that, when Plaintiffs and other juvenile prisoners failed to conform their conduct to the Center's rules and/or engaged in destructive or disruptive behavior, they deserved to be punished, and suffering pain and emotional distress from a restraint chair was such a punishment.

69. Prolonged placements in the restraint chair rarely deterred juvenile prisoners from failing to conform their conduct to the Center's rules and/or engaging in destructive or disruptive behavior because their behavioral or psychological conditions and/or abuse of licit or illicit drugs hampered their ability to make a rational cost-benefit analysis about future punishment before they engaged in misconduct.

70. Using restraint chairs in these circumstances served no legitimate penological interest.

71. By 2013, a reasonably competent assistant superintendent of a juvenile detention facility would have known that punishing juvenile prisoners by exposing them to cold isolation cells and prolonged immobilization in restraint chairs the way the Center did violated the prisoners' constitutional rights.

## V. Claim for Relief: Cruel and Unusual Punishment

72. Paragraphs 1 through 71 above are realleged and incorporated herein.

73. By their purposeful and/or deliberate indifference to Plaintiffs' injuries from being placed for lengthy periods in cold isolation cells without means to keep warm and the injuries of Plaintiffs J.H. and B.H. from being immobilized in restraint chairs hours after they had regained their self-control, Defendants, through the policies they established and pursued for their Juvenile Detention Officers, inflicted cruel and unusual punishment on Plaintiffs in violation of the Eighth Amendment as incorporated in the Fourteenth Amendment.

## VI. Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court:

a. declare that Defendants jointly and severally have violated Plaintiffs' civil rights, inflicting on them pain, emotional distress, and anxiety;

    b.    order such equitable relief as will make Plaintiffs whole for Defendants unlawful conduct; costs; and reasonable attorneys' fees;

    c.    enjoin Defendants from operating the Center's isolation cells and restraint chairs in an unconstitutional manner;

    d.    award to each Plaintiff compensatory damages in excess of $25,000, and, from Defendant Moore, punitive damages in excess of $25,000; and

    e.    grant such other relief as the Court may deem appropriate.

Respectfully submitted,

By: */s/ Edward R. Forman*
Edward R. Forman (0076651)
(*eforman@marshallandmorrow.com*)
John S. Marshall (0015160)
(*jmarshall@marshallandmorrow.com*)
MARSHALL AND MORROW LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

Andrew Biller (0081452)
(*andrewbilleresq@gmail.com*)
Trial Counsel for Plaintiffs
The Law Firm of Andrew Biller
Easton Town Center
4200 Regent Street, Suite 200
Columbus, OH 43219
(614) 939-9022
Fax (614) 583-8107

*Trial Attorneys for Plaintiffs*

**OF COUNSEL:**

Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (510) 250-9007

## Jury Demand

Plaintiffs demand a trial by jury of eight (8) on all issues and defenses triable to a jury.

By: /s/ Edward R. Forman
Edward R. Forman (0076651)